UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,     * <br>                                  * <br> Plaintiff,                   * <br>                                  * <br> v.                                      * <br>                                  * <br> MANUEL ROSARIO HERRERA, * <br>                                  * <br> Defendant.               * <br>                                  * <br>                                  * | Criminal Action No. 17-cr-10112-ADB |

**MEMORANDUM AND ORDER ON MOTION TO SUPPRESS EVIDENCE**

BURROUGHS, D.J.

Defendant Manuel Rosario Herrera is charged with possession with intent to distribute 100 grams or more of heroin, fentanyl, cocaine, and cocaine base in violation of 21 U.S.C. § 841. Currently pending before the Court is Defendant's motion to suppress all of the evidence obtained from a traffic stop and a related search of the vehicle that he was driving at the time of the stop. [ECF No. 21]. For the following reasons, Defendant's motion, with the exception of the $2,000 in cash seized during the pat frisk, is <u>DENIED</u>.

**I.     FACTUAL BACKGROUND**

Following consideration of the briefs, argument, and testimony adduced at an evidentiary hearing held on November 27, 2017, the Court makes the following findings of fact.[1] In late January 2016, the Drug Enforcement Administration ("DEA") began investigating a drug trafficking organization operating in the Boston, Dedham, and Revere areas. The investigation ultimately involved extensive physical and electronic surveillance of various persons and locations, including Starling Bladmir Gonzalez, Vinicio Baez, and Pacific Auto Sales, a car

---

[1] Defendant did not file a memorandum of law in support of his motion to suppress.

dealership that law enforcement understood to be owned by Vinicio Baez's brother, Wilson Baez, who was also a subject/target of the investigation.[2] On the morning of December 13, 2016, the investigation culminated with the execution of a series of arrest warrants and search warrants, including at the residences of Starling Bladimir Gonzalez and Vinicio Baez, both of whom had by then been identified as members of the drug trafficking organization, and at Pacific Auto Sales, where law enforcement had, during the course of the investigation, observed drug transactions and intercepted telephone calls related to drug trafficking.

While the search warrants and arrest warrants were being executed, investigators were also surveilling Wilson Baez's residence at 14 Bussey Street in Dedham. They first observed Wilson Baez drive away from the residence in a red Nissan Murano. After a failed attempt to follow him, the investigators returned to 14 Bussey Street and saw a woman leave the residence and get into a Chevy Avalanche. She drove one block away before parking it and walking back to 14 Bussey Street. After approximately 15 minutes, Defendant left 14 Bussey Street carrying a small white plastic bag. He placed the bag in the trunk of a black SUV and drove away.

The investigators at 14 Bussey Street conveyed all of these observations by radio to Massachusetts State Police Sergeant James Bazzinotti ("Sgt. Bazzinotti") who was stationed nearby in a marked police cruiser. He was instructed to effect a traffic stop of the SUV and, to that end, began following the SUV being driven by Defendant. After less than one minute, Sgt. Bazzinotti observed the SUV accelerate toward a highway ramp, drive outside of the ramp's travel lane, and nearly strike the curb.[3] He immediately stopped the vehicle and approached it.

---

[2] More specifically, the registered owner of Pacific Auto Sales was "Ramon Bernabel," an alias for Wilson Baez.

[3] Traffic was light in the area surrounding the highway ramp, only one car separated Sgt. Bazzinotti from Defendant's vehicle, and there was nothing obstructing Sgt. Bazzinotti's view of Defendant's vehicle.

He asked Defendant for his license and registration and explained that he had committed a marked lane violation. The officer asked Defendant who owned the vehicle and Defendant said his uncle was the owner. When asked to provide his uncle's name, Defendant looked at the vehicle's registration and read from it, "Florian, Maria." The officer asked whether Defendant's uncle was a woman and Defendant admitted that his uncle's name was not Maria Florian. Throughout this conversation, based on his shaking, stuttering and breathing rate, Defendant appeared to the officer to be nervous and stressed.[4]

One to two minutes into the traffic stop, Massachusetts State Police Trooper Kevin O'Hara arrived at the scene and Sgt. Bazzinotti then asked Defendant to step outside of the vehicle. In Sgt. Bazzinotti's opinion, Defendant continued to appear nervous and stressed.[5] After Defendant was out of the car, Sgt. Bazzinotti, with Trooper O'Hara standing next to him, asked Defendant if he had any weapons. Defendant removed a small knife from his pocket and immediately turned it over to Sgt. Bazzinotti. Sgt. Bazzinotti then pat frisked Defendant and felt a hard, square object in his right pant pocket, which he suspected to be contraband. He asked

---

[4] During argument at the evidentiary hearing, defense counsel mentioned that Defendant was not a native English speaker. Counsel did not assert that Defendant could not understand or speak English or that his English language proficiency in any way affected the reasonableness of the stop or the officers' inquiries. Defendant's affidavit submitted in support of his motion to suppress makes no reference to his native language or English proficiency. [ECF No. 21-1]. There is no evidence in the record that Defendant did not understand English or that his language skills in any way affected his understanding of the officer's inquiries. The record shows that Defendant attended Dedham High School and that Sgt. Bazzinotti spoke in English when addressing Defendant, who responded appropriately to at least some of the officer's questions.

[5] Sgt. Bazzinotti also testified that after Defendant exited the vehicle, he began posing questions to Defendant about Dedham High School, where both Defendant and Sgt. Bazzinotti had attended school, although Sgt. Bazzinotti was there many years before Defendant. Sgt. Bazzinotti asked about a specific teacher and class taught while he was a student there and then attributed Defendant's inability to answer such questions to stress and nervousness. Although the Court does not go so far as to find Sgt. Bazzinotti not credible, the Court affords this particular portion of the testimony no weight and disregards the government's attempt to justify the continuation of the stop on the basis of Defendant's understandable inability to answer irrelevant questions about a class and a teacher that were not likely part of his own high school experience.

Defendant to identify the object, and Defendant replied that it was money. Sgt. Bazzinotti removed a wad of $2,000 in small denomination bills from Defendant's pocket that, based on his experience, was wrapped in manner indicative of narcotics distribution. Sgt. Bazzinotti asked Defendant whether he had any weapons in the SUV. Defendant said that he did not and to "go ahead and check." Sgt. Bazzinotti proceeded to search the SUV and found, on the front passenger seat floor, a box of new sneakers, a wad of approximately 300 one-dollar bills, empty plastic bags that were consistent with drug distribution, and two cell phones. Sgt. Bazzinotti then opened the back of the SUV and found a plastic bag that contained what he believed to be heroin. Trooper O'Hara arrested Defendant and Sgt. Bazzinotti issued him a written warning for the traffic violation. Less than ten minutes elapsed from the initiation of the stop until the arrest.

## II. DISCUSSION

"Where a warrantless stop and search were conducted, the burden is on the government to prove that the stop and search were reasonable within the meaning of the Fourth Amendment." United States v. Lawrence, No. 13−10245, 2016 WL 9185278, at *1 (D. Mass. Feb. 25, 2016) (citing Florida v. Harris, 133 S. Ct. 1050, 1055 (2013)). Defendant's motion to suppress, including his affidavit in support, largely asserts that he never consented to the search of the vehicle.[6] At the hearing, Defendant also challenged the voluntariness of his alleged consent to the search and argued that the officers unreasonably prolonged the stop by questioning him about the SUV's ownership and ordering him to exit the vehicle.

---

[6] Defendant chose not to submit to cross-examination during the evidentiary hearing. Accordingly, the Court has the discretion to strike Defendant's affidavit. See United States v. Baskin, 424 F.3d 1, 3 (1st Cir. 2005). Because the Court credits much of the officers' testimony, "including the aspects disputed by the affidavit, striking the affidavit is unnecessary." United States v. Cabral, 965 F. Supp. 2d 161, 168 (D. Mass. 2013). Therefore, "[a]lthough permitted to do so," the Court declines to strike Defendant's affidavit but affords it only minimal weight. Id.

4

### A. Initial Stop

"The Fourth Amendment requires that traffic stops by police and the resulting temporary detention of individuals for questioning be reasonable, that is, based on probable cause to believe that a traffic violation has occurred," United States v. $572,204 in U.S. Currency, More or Less, 606 F. Supp. 2d 153, 157 (D. Mass. 2009) (citing Whren v. United States, 517 U.S. 806, 810 (1996)), or based on reasonable suspicion "that the occupants of the vehicle are engaged in criminal activity." United States v. Arias, 588 F. Supp. 2d 237, 238 (D.R.I. 2008) (citing United States v. Chhien, 266 F.3d 1, 5−6 (1st Cir. 2001)). The government provided uncontradicted testimony that an officer observed, from a close distance and without any visual obstruction, Defendant drive outside of an access ramp's travel lane and nearly strike the curb. During the ensuing stop, the officer explained to Defendant that he had committed a marked lane violation and ultimately issued him a written warning. The fact that the officer had probable cause to believe that Defendant had committed a traffic violation justified the stop.[7] See $572,204, 606 F. Supp. 2d at 157 ("marked lane violation for admittedly 'weaving' on the highway provided probable cause to stop him for violating the traffic laws"); United States v. Cintron, 592 F. Supp.

---

[7] At the hearing, defense counsel surmised that driving outside of a marked lane might not constitute a traffic violation. He did not brief the issue nor did he cross-examine any of the testifying officers about the elements of a marked lane violation. In reviewing a traffic stop based on a vehicle crossing over the fog line separating the driving lane from the shoulder, the First Circuit noted some ambiguity in the Massachusetts marked lane statute as to whether it applies only to unsafe lane crossings. See United States v. Lawrence, 675 Fed. Appx. 1, 3−4, 6 n.8 (1st Cir. 2017). The court explained, however, that it need not decide whether the driver actually committed a traffic violation, only whether the police officer "reasonably thought it was" a traffic violation. Id. at 4 (citing Heien v. North Carolina, 135 S. Ct. 530, 540 (2014)). The court further held that the officer had an "objectively reasonable belief that [the marked lane statute] prohibited a vehicle's straddling of a fog line while traveling" and the stop was therefore lawful. Id. at 6. Similarly, here, Sgt. Bazzinotti testified that he observed Defendant's vehicle drift outside of the access ramp travel lane and nearly strike the curb. Accordingly, Sgt. Bazzinotti had a reasonable basis to believe that Defendant committed a traffic violation and was driving unsafely.

2d 198, 201 (D. Mass. 2008) (finding probable cause to effect a stop where officer observed vehicle "being driven erratically, weaving in and out of lanes and almost hitting a barrier in the median").[8]

## B. Scope of the Traffic Stop

In reviewing the progression and scope of a traffic stop, "[a]ny action undertaken with respect to the stop 'must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation.'" United States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017) (quoting United States v. Ruidíaz, 529 F.3d 25, 28−29 (1st Cir. 2008) (internal quotations omitted)). The Court must evaluate "'whether the officer's subsequent actions were fairly responsive to the emerging tableau—the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed.'" United States v. Criswell, No. 08−10025, 2009 WL 3340160, at *3 (D. Mass. Oct. 15, 2009) (quoting Chhien, 266 F.3d at 6). In examining reasonableness, the Court considers "the totality of the surrounding circumstances," in order to make a practical, commonsense determination that includes "a measurable degree of deference to the perceptions of experienced law enforcement officers." Dion, 859 F.3d at 124 (citations and quotation marks omitted).

---

[8] Because the stop was lawful, Defendant cannot argue that it was invalid solely because it was pretextual and done in aid of a drug trafficking investigation. "The detention of a motorist based on probable cause does not violate the Fourth Amendment's prohibition on unreasonable seizures even if an officer would not have stopped the motorist absent some additional law enforcement objective." United States v. $572,204 in U.S. Currency, More or Less, 606 F. Supp. 2d 153, 157 (D. Mass. 2009); see United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) ("An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else."). "This premise effectively forecloses any argument that pretext might invalidate an otherwise justified traffic stop." $572,204, 606 F. Supp. 2d at 157.

6

1. <u>Questions About the Vehicle's Ownership and Exiting the Vehicle</u>

Defendant contends that the stop, even if initially justified, was unreasonably prolonged by the officer's inquiries about the vehicle's ownership and his order that Defendant step outside of the vehicle. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, . . . and attend to related safety concerns." <u>Dion</u>, 859 F.3d at 123−24 (quoting <u>Rodriguez v. United States</u>, 135 S. Ct. 1609, 1614 (2015)). An officer's "mission" includes, among other things, "'ordinary inquiries incident to [the traffic] stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." <u>Id.</u> (quoting <u>Rodriguez</u>, 135 S. Ct. at 1615). Here, the officer's questions about the ownership of the vehicle lasted for only a minute and were related to the inspection of the vehicle's registration. He continued his inquiry as a result of Defendant's contradictory responses and nervous demeanor. <u>See</u> <u>United States v. Sowers</u>, 136 F.3d 24, 27 (1st Cir. 1998) (officer's mounting suspicions were not unreasonable where district court credited testimony that vehicle's occupants showed "excessive nervousness" and told "conflicting stories"). It was not unreasonable for the officer to ask Defendant these basic questions about the vehicle's ownership and registration.

Defendant also asserts that the officer directed him to exit the vehicle to impermissibly delay the stop. "Officers making a traffic stop do not violate the Fourth Amendment by requiring the driver and passengers to exit the vehicle." <u>Cintron</u>, 592 F. Supp. 2d at 201; <u>see id.</u> at 202 ("Removal of the vehicle's occupants was clearly permissible even absent a showing of probable cause"); <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 n.6 (1977) (holding that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver

to get out of the vehicle"). Moreover, an officer may order the driver to exit the vehicle "as a matter of course" and "does not need to have an independent fear for his safety." Ruidíaz, 529 F.3d at 32; see United States v. Coplin, 463 F.3d 96, 102 (1st Cir. 2006) (under Mimms and its progeny, "a police officer may, as a matter of course, require the driver of a car lawfully stopped for a suspected traffic violation to step out of his vehicle"). Because the initial traffic stop was lawful, the officer's instruction to Defendant to step outside of the vehicle was permissible.

2.  Questions About Weapons and Pat Frisk

After Defendant exited the SUV and moved toward the rear of the vehicle, the officer asked Defendant whether he had any weapons on him and then pat frisked him after he produced a knife. "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555, U.S. 323, 333 (2009); see United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007) (questioning driver about the presence of weapons during traffic stop is permissible so long as the questioning does not extend the length of the detention). Courts have also held that "generalized concerns about officer safety justify routinely asking about possession of weapons during traffic stops." United States v. Oung, 490 F. Supp. 2d 21, 33 (D. Mass. 2007) (citing United States v. Holt, 264 F.3d 1215, 1221−26 (10th Cir. 2001) (en banc)); see United States v. Noble, 762 F.3d 509, 525 (6th Cir. 2014) ("Police officers may ask a few questions regarding weapons and criminal activity, regardless of the stops' original purpose."); United States v. Everett, 601 F.3d 484, 494–95 (6th Cir. 2010) (noting widespread agreement that "officers conducting a traffic stop may inquire about dangerous weapons" and that Supreme Court has emphasized officer safety during a traffic stop); see also United States v. May, 203 F.3d 53, 1999 WL 1215651, at *3 (D.C. Cir.

1999) (unpublished) (questioning driver about whether he had a gun is "an expedient way for the officer to evaluate his personal safety and the need to take further precautions"). Here, asking Defendant whether he had any weapons on him, which took at most a minute or two, did not meaningfully extend the length of the stop and was otherwise reasonable under the circumstances then known to the officer. See United States v. Chaney, 584 F.3d 20, 26 (1st Cir. 2009) ("officer's initial inquiries . . . took at most a minute or two and did not measurably extend the duration of the stop."); United States v. Derverger, 337 Fed. Appx. 34, 36 (2d Cir. 2009) (five minutes of questioning did not measurably prolong the traffic stop).[9]

Defendant's possession of the knife provided reasonable suspicion that Defendant could be armed and dangerous, and justified the pat frisk. See United States v. Bong, 596 Fed. Appx. 607, 611 (10th Cir. 2014) ("Once the officer had certain knowledge [defendant] possessed a weapon, he was entitled to conduct a protective frisk to ensure no other weapons were present."); United States v. Underdue, No. 14−115, 2015 WL 9672912, at *4 (E.D.N.C. Oct. 23, 2015) (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)) ("Upon learning that [defendant] was in possession of a concealed firearm, lawfully or otherwise, the officers were entitled to conduct a weapons frisk 'to allow the officers to pursue [their] investigation without fear of violence.'").

---

[9] Sgt. Bazzinotti's question was also reasonable considering the uncontroverted evidence that he was aware that the investigating agents had observed Defendant enter the residence of a subject/target of a year-long drug trafficking investigation and exit that residence with a small plastic bag; that Defendant appeared extremely nervous and stressed during the traffic stop; and that Defendant gave odd and contradictory answers to questions about the vehicle's ownership. See Dion, 859 F.3d at 125−26 ("odd answer to a concededly appropriate question about travel itinerary" was relevant to determination of reasonable suspicion); United States v. Arnott, 758 F.3d 40, 45 (1st Cir. 2014) (officer had reasonable suspicion to believe defendant was dangerous where he appeared "unduly nervous when questioned" and the police had reason to believe that the vehicle's occupants "had just concluded a drug-related transaction," because "[t]he connection between drugs and violence is . . . legendary"); see also United States v. Mendonca, 682 F. Supp. 2d 98, 106 (D. Mass. 2010) (progression of questioning from "identity and itinerary to drugs was well within [officer's] authority under the circumstances of his growing suspicions").

Given the presence of the knife, the pat frisk was a reasonable next step by law enforcement to confirm that Defendant did not possess any other weapons that could jeopardize the safety of the officers.

### 3. Seizure of the Cash During the Pat Frisk

Defendant next claims that even if the pat frisk was lawful, the officer improperly seized the $2,000 in cash found in his pocket. The "plain feel" doctrine allows an officer to seize an object during a lawful pat frisk "if its incriminating character is immediately apparent." United States v. Schiavo, 29 F.3d 6, 9 (1st Cir. 1994). "The plain feel doctrine does not, however, permit an item to be seized if its incriminatory nature only comes to light after further inquiry or search, such as 'squeezing, sliding [or] otherwise manipulating the contents of the defendant's pocket.'" United States v. Henry, 827 F.3d 16, 27 (1st Cir. 2016) (quoting Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)). In Henry, the First Circuit upheld the district court's determination that an officer reasonably seized a large wad of cash from the defendant's pocket during a pat frisk, because the officer "'recognized from his initial [pat frisk] that the bulge in [defendant's] pocket was a large amount of cash and that he was 'immediately aware of the cash's incriminating nature'" as evidence of drug or sex trafficking. Id. at 21, 27.

Although the pat frisk of Defendant was lawful, the seizure of the cash exceeded its permissible scope, because the government has not adequately established that the incriminating nature of the cash was immediately apparent to the officer. According to Sgt. Bazzinotti's uncontradicted testimony, he felt a hard, square object in Defendant's pocket that might have been "contraband," and Defendant told him that the object was money before he removed it. The record does not reflect what type of contraband Sgt. Bazzinotti suspected the object to be, nor does it indicate Sgt. Bazzinotti's impression of the object prior to Defendant telling him it was

10

money. See Schiavo, 29 F.3d at 9 (incriminatory nature of object was not immediately apparent where testifying officer admitted "that he did not immediately know what was in the defendant's pocket after conducting the [pat frisk] and only became aware of its contents after removing the item"). After removing the object, Sgt. Bazzinotti testified that it was wrapped in a manner consistent with drug trafficking, but there is inadequate support to establish that he identified the incriminating nature of the object before removing it. The seizure of the cash under these circumstances exceeded the permissible scope of the pat frisk, which is permitted to ensure the safety of the officer, but very limited beyond that specific purpose. The cash seized during the pat frisk shall therefore be suppressed.[10]

### C. Vehicle Search

Defendant's motion primarily challenges the claim that he voluntarily consented to the search of the SUV he was driving after the officer asked if there were any weapons in the vehicle. "[A] warrantless search may be conducted with the voluntary consent of a person authorized to give such consent" but cannot "exceed the scope of the consent granted." United States v. Chaney, 647 F.3d 401, 405−06 (1st Cir. 2011).

---

[10] The parties have not addressed whether the cash seized during the pat frisk may be admissible under the inevitable discovery doctrine. See United States v. D'Andrea, 648 F.3d 1, 12 (1st Cir. 2011) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)) (Where the government establishes that evidence obtained in violation of the Fourth Amendment "ultimately or inevitably would have been discovered by lawful means," then suppression is not required); United States v. Xiarhos, 820 F. Supp. 634, 636 (D. Mass. 1993) (contraband unlawfully seized during a pat frisk would have been inevitably discovered by a search incident to arrest or an inventory search). The Court declines to consider the application of the inevitable discovery doctrine sua sponte. See United States v. Sinkler, 267 Fed. Appx. 171, 174 (3d Cir. 2008) (district court properly considered inevitable discovery doctrine where defendant "had the opportunity to, and did, adduce evidence relating to the theory of inevitable discovery"); see also United States v. Crespo-Rios, 645 F.3d 37, 42 n.3 (1st Cir. 2011) (although government did not expressly advance an inevitable discovery argument on appeal, and it was unclear whether it did so before the court below, First Circuit addressed the inevitable discovery doctrine, because the court below did so, thereby giving defendant "the opportunity to argue it was inapplicable").

1. <u>Voluntariness</u>

To assess whether consent was given voluntarily, the Court considers "the totality of circumstances, including the person's 'age, education, experience, intelligence, and knowledge of the right to withhold consent.'" <u>United States v. Ramdihall</u>, 859 F.3d 80, 89 (1st Cir. 2017) (quoting <u>United States v. Forbes</u>, 181 F.3d 1, 6 (1st Cir. 1999)). The Court also weighs "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." <u>Id.</u> (citation omitted). The government bears the burden of demonstrating valid consent by a preponderance of the evidence. <u>See</u> <u>Forbes</u>, 181 F.3d at 5.

Here, the officers did not ask to search the vehicle but rather Defendant "invited the police to search his vehicle in response to their inquiries about whether it contained a weapon." <u>United States v. Mercado</u>, No. 10−10226, 2011 WL 3861617, at *4 (D. Mass. Aug. 30, 2011) (finding voluntary consent to search the entire vehicle). Sgt. Bazzinotti asked once whether Defendant had weapons in the vehicle, and he and Trooper O'Hara testified consistently that Defendant replied that he did not and to "go ahead and check." Defendant was not under arrest or handcuffed when the officer questioned him. There is no evidence that the officers had their weapons drawn, that they prompted Defendant to consent to the search, or that they implied that they would search the SUV regardless of Defendant's consent. <u>Compare</u> <u>Ramdihall</u>, 859 F.3d at 89 (affirming district court's finding of voluntary consent where "there was never any physical constraint, no handcuffing, no display of drawn weapons [and] the character of the interrogation was mild") <u>and</u> <u>Cepulonis</u>, 530 F.2d at 244 (finding valid consent where defendant was handcuffed and surrounded by agents, two of whom had their weapons drawn) <u>with</u> <u>United States v. Smith</u>, 533 F. Supp. 2d 227, 232 (D. Mass. 2008) (consent was not obtained voluntarily

where "a reasonable person in [defendant's] shoes would have understood the officer to be asserting lawful authority to conduct the search").

Defendant points out that the officers did not inform him of his right to refuse permission to search, but "the rule is that a failure to inform a suspect that he is entitled to withhold his consent to a vehicle search, though relevant to the issue of voluntariness, does not preclude a finding of consent." United States v. Zapata, 18 F.3d 971, 977 (1st Cir. 1994). He also suggests that the presence of two officers during the questioning at the rear of the vehicle was inherently coercive. The First Circuit has held, however, "that valid consent may be given notwithstanding significant police presence." Mercado, 2011 WL 3861617, at *5; see United States v. Dunbar, 553 F.3d 48, 57 (1st Cir. 2009) (consent was not coerced where defendant was "removed from his car by a police officer and placed in the back of a police cruiser"); United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008) (circumstances of giving consent were not coercive where "some ten to fifteen government agents, guns drawn, entered [defendant's] hotel suite without knocking, handcuffed him, placed him in a separate room, and proceeded to interrogate him"); cf. Ramdihall, 859 F.3d at 89 (rejecting defendant's argument that, among other things, the arrival of five other officers as backup rendered his consent involuntary).[11] Considering the short

---

[11] Defendant also was not in custody at any time prior to his arrest. Traffic stops generally do not require officers to give Miranda warnings unless "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" United States v. Campbell, 741 F.3d 251, 266 (1st Cir. 2013) (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). To determine whether a traffic stop implicates a restraint on freedom to the same extent as a formal arrest, the Court considers, inter alia, "(1) 'whether the suspect was questioned in familiar or at least neutral surroundings;' (2) 'the number of law enforcement officers present at the scene;' (3) 'the degree of physical restraint placed upon the suspect;' and (4) 'the duration and character of the interrogation.'" Id. (quoting United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011)). Here, Defendant was questioned at a neutral location by one to two officers. Id. at 267 (defendant was not in custody where he was questioned "by at most two officers" in a public parking lot). There is no evidence that the officers made any showing of force, nor was Defendant handcuffed. At each stage, the officers observed or otherwise uncovered additional information that supported their further

13

duration of the stop, the limited and mild nature of the questioning, and the lack of any other showing of force by the officers, the mere presence of the two officers was not coercive.

The impermissible seizure of the cash during the otherwise lawful pat frisk also did not taint Defendant's consent to search the vehicle. "[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." United States v. Delgado-Perez, 867 F.3d 244, 256 (1st Cir. 2017) (quoting New York v. Harris, 495 U.S. 14, 19 (1990)). The question of whether to suppress evidence found after the seizure of the cash depends on whether it was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 256−57 (quoting United States v. Finucan, 708 F.2d 838, 843 (1st Cir. 1983)). The taint inquiry takes several factors into consideration, including the "temporal proximity" of the illegal search to the consent, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct," with an emphasis on determining "whether the prior illegality 'significantly influenced' or 'played a significant role' in the subsequent consent." Id. at 257 (citations omitted).

Here, the short time between the seizure of the cash and Defendant's consent to search the vehicle favors Defendant. See United States v. Montgomery, 777 F.3d 269, 273−74 (5th Cir. 2015) ("There is . . . substantial authority for the proposition that consent given within a few seconds or minutes of the violation generally favors the defendant."). As discussed above, however, the initial stop was lawful and all of the steps preceding the seizure of the cash were justified, including the pat frisk. Prior to asking Defendant whether there were any weapons in the vehicle, the officers had recovered a knife from Defendant, observed his nervous and stressed

---

inquiry. The stop and search lasted less than ten minutes altogether and therefore was not inappropriately prolonged.

demeanor, and learned that he had left the residence of a target of a drug trafficking investigation and put something into the SUV's trunk just prior to the stop. These circumstances, which supported the officer asking Defendant whether he had weapons on his person, also justified asking whether there were weapons in the vehicle. See United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007) (quoting Muehler v. Mena, 544 U.S. 93, 101 (2005)) (asking whether there are "any weapons or contraband in the vehicle" is constitutional so long as the traffic stop questions do not "'extend[] the time' that a driver was detained"); United States v. Jones, No. 06−54, 2006 WL 2711735, at *3 (E.D. Tenn. Sept. 21, 2006) (officer's question about guns in the vehicle was not overly intrusive where it occurred "just over a minute into the encounter" and did not delay the encounter). Nothing in the record suggests that, absent the seizure of the cash, the police would not have asked whether there were weapons in the vehicle or that the seizure of the cash in any way led to the consent or the search of the vehicle.

Moreover, the pat frisk which revealed the hard, square object in Defendant's pocket was lawful and it was this lawful activity that prompted Defendant to admit that the object was money. The seizure of the cash, therefore, disclosed a very limited amount of new information, if any, given that the officer already knew, prior to the seizure, that the object he had felt was money. The record does not suggest that the *seizure* of the cash, or even the knowledge of the cash, in any way influenced Defendant's unprompted invitation to search the vehicle for weapons. See Montgomery, 777 F.3d at 272 (quoting LaFave, Search & Seizure § 8.2(d) (5th ed.) (finding that defendant's consent purged taint of allegedly improper pat frisk and noting that "'[e]ven less is required to show that the consent is voluntary and untainted' when the consent is unsolicited"); United States v. Luna, 76 Fed. Appx. 411, 413−14 (3d Cir. 2003) (defendant's unsolicited consent to search was not tainted by prior impermissible pat frisk during the course

of traffic stop where officer "had probable cause to initiate the traffic stop, the [pat frisk] was very brief," and reasonable suspicion justified extending the scope of the stop); United States v. Whiteside, 22 Fed. Appx. 453, 461 (6th Cir. 2001) (defendant's invitation to officer to search his vehicle "purged any taint" of officer's unwarranted pat frisk). Finally, the seizure of the cash did not amount to purposeful or flagrant misconduct. The credible, uncontradicted testimony showed that during a lawful pat frisk, the officer felt a hard, square object that he thought might have been contraband. Under the circumstances, although the record did not establish that the object's criminal nature was immediately apparent, the seizure was conducted in good faith and did not flagrantly or grossly overstep the bounds of a pat frisk. Accordingly, the government has shown that Defendant's consent was voluntary and untainted by the impermissible seizure.

    2.    Scope

The scope of Defendant's consent is measured by a test of objective reasonableness: "what would the typical reasonable person have understood by the exchange between the officer and the [defendant]?" United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). When Defendant said "go ahead and check," the typical reasonable person would have understood Defendant to have consented to a search of any area of the vehicle where a weapon might reasonably be found, including in any easily accessible containers inside of the vehicle.[12] See Mercado, 2011 WL 3861617, at *4 (defendant's statement, "[y]ou can check it if you want," constituted "an express invitation to police to search the entire

---

[12] "It is . . . well settled that a general consent to search a motor vehicle subsumes the specific consent to search any easily accessible containers within the vehicle." United States v. Zapata, 18 F.3d 971, 977–78 (1st Cir. 1994) ("Because the duffel bags were lying in the trunk, appellant's general consent to a search of the automobile constituted consent to a search of the duffel bags."); see United States v. Forbes, 181 F.3d 1, 6 (1st Cir. 1999) ("[I]t is reasonable to construe [defendant's] consent to search the automobile as encompassing consent to search the trunk").

vehicle, including its trunk"); Melendez, 301 F.3d at 32 (citing United States v. Harris, 928 F.2d 1113, 1115, 117 (11th Cir. 1991)) (officer permissibly unzipped luggage in trunk "after permission was given to 'look in' car and make sure there weren't any illegal drugs, weapons or contraband")). Sgt. Bazzinotti and Trooper O'Hara testified consistently that Sgt. Bazzinotti specifically asked whether Defendant had any weapons in the vehicle, as opposed to on his person. There is no evidence that after telling the officers to "go ahead and check" that Defendant in any way attempted to limit the search, although he was physically present while the search was performed and knew that the officer was looking for weapons. Because Defendant voluntarily consented to a general search of the vehicle, the officer permissibly searched the vehicle's trunk and found the plastic bag containing what the officer believed to be heroin.

### III.    CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence, with the exception of the $2,000 in cash seized during the pat frisk, is DENIED. [ECF No. 21].

**SO ORDERED.**

February 22, 2018                                         /s/ Allison D. Burroughs
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE